CITY MAGISTRATES COURT—FIRST DIV.—SIXTH DISTRICT,

Dec., 1913.

# THE PEOPLE ex rel. CHAS. J. SILBERBAUER v. CHAS. LAUX.

(1.) AUTOMOBILE—VIOLATING SPEED LAW—MOTOR TRUCK.

> To operate or drive any vehicle along the streets of New York at a rate of speed " likely to endanger the life or limb or property of any person " is an offense under the speed regulating ordinance from which provision no one is exempt.

(2.) SAME—EXEMPT CLASS.

> No specific rate of speed can be *prima facie* or conclusive evidence of recklessness, the burden of proof is upon the People and the time, place, circumstances and conditions are prime factors.

(3.) SAME.

> Defendant with motor truck while carrying U. S. Mail, was speeding through the crowded streets, giving no signals—turning corners at eighteen miles an hour, etc., etc. Held, that he was guilty of violating the speed regulation ordinance.

DEUEL, C. M.

The defendant is charged with having violated the speed regulating ordinance while operating a motor truck carrying United States mail from P. O. Station T, on East One Hundred and Sixty-fifth street, to P. O. Station R, on East One Hundred and Forty-ninth street, in the County of Bronx.

The officer's attention was called to the defendant at One Hundred and Sixtieth street by the fact that he was going " quite speedy; " he was then followed to One Hundred and Forty-ninth street, maintaining a speed of twenty-four miles

per hour, as indicated by a speedometer on the officer's machine. At One Hundred and Sixtieth street he " cut right in front " of a Third avenue trolley car; at One Hundred and Fifty-fifth street several men in trying to cross the avenue were forced to seek the shelter of elevated railroad pillars; at One Hundred and Fifty-third street a girl on crossing had " to jump from in front of this wagon to the sidewalk; " at One Hundred and Forty-ninth street " there was large crowds crossing the street and he gave no signal of any kind, and he did not put out his hand, and turned this corner at about eighteen miles an hour, scattering the people right and left." The officer further testified that the defendant did not sound his gong once during the entire trip.

The defendant, examined as a witness in his own behalf, testified that he did sound his gong; that the truck could not make the speed testified to by the officer because it was controlled by a " governor " that limited its speed to fifteen miles an hour; that " there may have been one or two people " at One Hundred and Fifty-fifth street, but " I rang my bell for them and they stepped back," and " when I got to One Hundred and Forty-ninth street I slowed down and rang my bell and the people got out of the way."

As to the " governor " the defendant testified that it could be manipulated by tools so as to reduce the speed below, or to increase it above, fifteen miles, but that he had no such tools with him, and knew nothing about using them. This testimony is unreliable; evidently it was entirely founded upon information obtained from others. It does not exclude the possibility that the " governor " was set at twenty-four or twenty-five miles an hour, and relying upon statements of others, the defendant put the truck to its full speed, believing he was going only fifteen miles an hour. The officer's testimony, founded upon the mechanical contrivance attached to his machine, must

be accepted as more reliable, and also that the defendant turned the corner at "about eighteen miles an hour," which, doubtless, was an estimate from the officer's experience.

While the rate of speed is not a controlling factor in some, it is an important factor in nearly every prosecution for highway recklessness; especially is this true when such charge is made against an operator of one of the vehicles included in the exempt class of section four.

But to operate or drive any vehicle along the streets of this city at a rate of speed "likely to endanger the life or limb or property of any person" is an offense under the speed regulating ordinance, from which provision no one is exempt, whether he be the owner or the chauffeur of a private automobile or an operator of any of the vehicles enumerated in section four. The distinction between these two classes—non-exempt and exempt—which the ordinance makes is this: A rate of speed of fifteen to twenty miles per hour in the built-up portions of the city, on the part of the non-exempt, is made *prima facie* evidence of speed recklessness, and may be rebutted; over twenty miles an hour is conclusive in that respect and cannot be rebutted; time, place, circumstances and conditions can play no part where the speed exceeds twenty miles; they are only material in the imposition of judgment.

As to the exempt class, no specific rate of speed, whether it be fifteen or forty miles an hour, can be either *prima facie* or conclusive evidence of recklessness, the burden of proving which rests upon the People, and in such prosecutions time, place, circumstances and conditions are prima factors.

Section four, as I read it, was not intended to be nor should it be so construed, an unlimited license to use the public streets with reckless disregard of the personal and property safety of others. In all cases, the spirit of the ordinance, as disclosed in the opening sentence, should control. "No person

shall operate, drive or propel  *  *  *  on any public high-way in the City of New York any  *  *  *  motor vehicle, however propelled  *  *  *  recklessly or negligently, or at a speed or in any manner so as to endanger, or to be likely to endanger, the life or limb or property of any person."

In so far as a straightaway course is concerned there can be no question as to the application of this provision to vehicles in the exempt class. As to turning corners at intersecting streets, the language of section 4 is quite unfortunate, if the aldermen intended that operators in the exempt class are also to be answerable for gross negligence falling short of some fatality. Turning such a corner was regarded so extremely dangerous as to make a rate of speed of over four miles an hour on the part of an ordinary automobile conclusive evidence of recklessness. Realizing that such a point was so fruitful of public peril, did the law-making powers of the city intend that operators of exempt vehicles may proceed at any rate of speed satisfactory to themselves, or, as testified to in this case, more than four times as fast as is permitted to ordinary vehicles, including those drawn by horses? If they did so intend, the provision is so repugnant to the general law as to raise a question of its validity. Conditions frequently exist when turning a corner at a rate of speed much less than four miles an hour would be the height of imprudence. Did the aldermen intend that it should be optional with the operator of any vehicle, under such circumstances, to go as he pleases and be answerable to none if good luck carries him through without a fatality? Why should a straightaway course, involving many less dangers, make all operators liable under the ordinance, and turning corners free some of them from responsibility? These questions, in connection with the spirit of the act and of all of its sections, raise a doubt in my mind that the literal construction of section 4 was intended.

Reaching this result and in rendering judgment I take the street corner turning incident into consideration in connection with all the other facts and circumstances established at the trial. I take also into consideration the fact, within common knowledge, that One Hundred and Forty-ninth street and Third avenue is an inter-transfer point between the subway and the elevated road, which of itself tends to swell the number of persons having occasion to use the crossings, and calls for extra prudence on the part of those who control moving vehicles.

The defendant is found guilty as charged in the complaint.